Good morning. Good morning. My name is Perry Clark. I represent the appellant Petroliam Nasional Berhad, known as Petronas. That's the mark under which they operate and the mark at issue in this contributory cybersquatting matter. Would you raise the microphone a little? Yes. Thank you for pointing that out. Why is there contributory liability under the statute? Why is there? Yeah, the statute doesn't have any language to that effect. Is there any circuit court that's held that? And why should we hold that if we have to? Okay. You are right. The statute does not mention contributory liability. And you are also correct. No district court or, I'm sorry, no circuit court has found contributory liability with respect to the ACPA, the cybersquatting statute. But as cases even cited by the appellee make clear, when Congress passes a law and does not address existing common law doctrines, existing case-made law, in this case, the law of contributory trademark infringement, those laws are not obligated. But cybersquatting is not a common law doctrine. I mean, the trademark contributory context arises out of an ancient problem of people stealing things that don't belong to them or helping to make that possible. This is an entirely new issue. It didn't even exist before. And I would at least ask your thoughts. Where's the common law about cybersquatting? You're right. You're absolutely right. There is no common law of cybersquatting. So when Congress passes a law about cybersquatting, we really can't say that they're deemed to take into account common law about that issue, right? Because there isn't any. Well, you're right. But they can take into account the common law of contributory infringement. Well, they can do whatever they want, but they didn't. They didn't put anything in there. I mean, that's what's puzzling to me. And they have a specific mens rea. There has to be bad faith. They limit who can bring it. That's the registrant. So it seems like a reasonably specific statute. And there's no common law framework. So I'm puzzled about where what's the evidence that we should read in this contributory liability standard. Okay. Yeah, I can understand your confusion. And I would refer you specifically to 15 U.S.C. 11142D3. And that section says, A domain name registrar, a domain name registry, or other domain name registration shall not be liable for damages under this section for the registration or maintenance of a domain name for another, absence of showing of bad faith. Now, that is a description of secondary liability. To do something for another is what creates secondary liability. Let me ask you another question. What harm would be addressed by contributory negligent cyber spotting liability that is not already addressed by the civil action in 15 U.S.C. 1125D1A and the in rev action in 15 U.S.C. 1125D2A? Everything, and those are explicit. Here you're saying nothing is said, therefore, we should discover it. Right. Right. As you say, what is missing from the statute, what conduct is not covered by the statutes that would be covered by contributory liability? Well, that's the same as what's covered for contributory trademark infringement. That's what the Supreme Court found in the Inwood case. There's contributory trademark infringement. Cyber spotting is trademark infringement. And there's no reason to rule for the first time that contributory liability does not attach to the brand of trademark infringement known as cyber spotting. So to answer your question directly, the conduct that is not covered in the statute is the conduct of knowingly continuing to provide a service that allows a cyber spotter to continue that cyber spotting. But what troubles me, I mean, here you have a situation where, I mean, in this case it's go get daddy, but it could be anybody that performs this function. There's really no human involvement here. You've got this computer. It's very common to have these things where you have people that type the wrong thing and it says .net, .com or whatever. It all gets channeled in automatically in a nanosecond by a computer. There's no human being there looking at the pictures or changing this or changing that. Isn't this the very kind of thing that Congress intended to accept from the liability portions of the cyber spotting law? Absolutely not. This is not. This is not a case about the registration of a domain name. It is not. We have no problem with the initial registration of PatronusTower.net or PatronusTowers.net. Our issue, the conduct issue in the district court, was the refusal of GoDaddy to stop providing its domain name forwarding service that connected the Patronus domain names to a pornographic website owned by GoDaddy's customer. Now, the notion, I'd like to address directly your point about the automatic. Okay. That is not what happened here. What we did was when we first discovered this infringement on the PatronusTower.net domain name, that was the first domain name, we filed a trademark request under GoDaddy's policy requesting that they stop providing this service. There is no dispute that that notice complied entirely with GoDaddy's own policy. We filed this action asking that they stop providing that service. The district court eventually entered an in-rem judgment transferring the domain name to us. So for that domain name, they knew we wanted it taken down when we filed the temporary restraining order. So there was human interaction. There were their lawyers. Then, after the first domain name had been transferred, we discovered the second domain name, PatronusTowers.net. Same registrant customer, same customer using GoDaddy's domain name forwarding service, forwarding the PatronusTowers.net domain name to the same pornographic website owned by that customer. And I sent an e-mail to Mr. Slavsky, and I said, would you please stop providing that service. So there is human interaction. Well, you're conflating the mechanical part of it with your litigation. That's not what I'm talking about. Years ago, I wrote a case called Perfect 10 v. Visa at the same time Judge Yakuda wrote one about Google and interesting issues. But in that case, you had a claim, in the Visa claim, you had a claim that there were people who were stealing copyrighted issues or copyrighted photographs and so on. You had the credit card companies that made it possible for the thieves to get away with this. And they said, Perfect 10 sent all kinds of notices to them and said, you know, we want you to stop servicing these people. And the answer was, hey, you know, look, we're just you've got machines in here, you've got these nanoseconds. It doesn't we're not supposed to be doing that. We're not policing that. And we concluded that they were correct because if you can blame them, you can also blame the electric company because they were providing the power. You could blame Dell because they were providing computers and so on. At some point, you have to, I think, and Congress seems to have done this, if you're going to hold people liable, there's got to be bad faith involvement or something that shows that they are contributing directly to this. It's not just an indirect thing that is happening in terms of computers, don't you think? Yes, I agree. And I agree. The Perfect 10 decision, when you're talking about credit card companies that are funding the transactions, that's completely removed from the actual making the images available. Here, we have a domain name forwarding system designed by GoDaddy, built by GoDaddy, hosted on GoDaddy services that was stopped as soon as the district court ordered them to transfer the domain name. Without this domain name forwarding service, there would have been no connection. So then when you got a court order for the second name, they stopped that too, right? So I'm not understanding that argument. Maybe you could help me with distinguishing Lockheed, where we said it's like the post office, it's just forwarding mail. Right. And it's a little hard for me to distinguish this service from what there was in Lockheed as opposed to Louis Vuitton, where there was a server, where they were hosting a server. So maybe you could address that. Absolutely. So the Lockheed case, so the panel in Lockheed affirmed a district court's grant of summary judgment finding no liability. And in a couple places in that opinion, the panel referred to the defendant, NSI's routing service. But I think the only fair reading of the Lockheed case is that the conduct at issue there was the conduct established in the district court's summary judgment record. It's not routing services writ large. It's not anything that looks like the postal service. It's what NSI did. And how do we know what NSI did? How do we know what NSI did? If you look at the Lockheed decision, this is 194, F3rd, 980. The quote I'm going to read is at page 985. The Ninth Circuit says, as the district court correctly observed, NSI's involvement with the use of domain names does not extend beyond registration. But they also said that all evidence in the record indicates that NSI's role differs little from that of the United States Postal Service. When an Internet user enters a domain name combination, NSI translates the domain name combination to the registrant's IP address and routes the information to the corresponding computer. And we said that was okay. So isn't that what GoDaddy is doing here? Absolutely not. No. You have to understand. Call forwarding somehow makes it completely different than this? Domain name forwarding is completely different. Why is that? And how do we know that? Are they hosting? They are. Are they physically hosting the website? Yes. So to answer your question. The hosting of the Petronas Net website is on GoDaddy's servers? Yes. Is that what you're saying? And if I would refer you to ER0308. What is it again? ER0308. And this is an email from before the litigation began from an internal GoDaddy employee who was tasked to examine the complaints from the U.S. government saying, you know, we think there's some sort of infringement going on here. There's something going on with this Petronas website. And he was asked to look into this. And what does he say? Reviewing this domain complaint, I found that it is hosted on ParkWeb. ParkWeb is the GoDaddy domain name server. It's undisputed. So I think at the very least, you have something that the jury could have found at a full trial that there was at least hosting. But getting back to Lockheed, if a fair reading of Lockheed is what the district court found, and what did the district court find? That all NSI did was provide registration. And why is that important? Because finally, after years of litigation, GoDaddy admits in its brief on page 45, registration is different than domain name forwarding. That's the key. The key is we're not talking about registration. So all of these harms from the amicus, all of this, the sky is falling, the Internet will stop working, all of that is based on complaints about initial registration of a domain name. It's not what we're talking about. We're talking about the continued provision of a service that GoDaddy should have known was contributing to cybersquatting. So Excuse me, let me just ask. Is GoDaddy supposed to investigate everybody with a domain name? How many hundreds or thousands are we talking about? Absolutely not. They are absolutely not. If bad faith is supposed to be proved, what kind of – what are you requesting that GoDaddy be required to do? Well, in this case, remember, in this case, there was already a finding that the first domain name was committing cybersquatting, right? Because there was a transfer of the domain name pursuant to the Cybersquatting Act, the NREM proceeding. And in the NREM proceeding, the district – granted, this was a default proceeding. It wasn't opposed because the registrant didn't show up. But I think that even in itself shows that if the registrant was acting in good faith, wouldn't it have said something? But don't you have to show that the server, the ISP, I guess the GoDaddy service, was also acting in bad faith? No. And how would you show bad faith of them? Not for the contributory claim. So the contributory liability, which is not in the statute, the statute has a bad faith requirement for the person actually doing it, but you're saying you wouldn't have to show bad faith for the person who was contributorily liable? Well, yes, I am. But remember, to show contributory liability, you have to show knowledge. You have to show direct control and monitoring of the means of infringement. And, of course, I can't cite you a case that says knowledge that you're supplying something to somebody who's breaking the law is bad faith. But for the purposes of the contributory liability framework, if you know of somebody who's committing infringement and you ignore it, that's willful blindness. And that actually is bad faith. Suppose we do not accept your contributory liability. Where are you left? Don't you have to prove bad faith? If you – if this Court finds, if this is the first Court in the country to find that there is no contributory liability under the ACPA, then we lose. All right. Thank you. And be the only Court to do that. But if I may, may I address that point, though? Because I can't tell if the Court is more hung up on that point. Is the registration point clear, the registration versus forwarding? Okay. Well, so just on the contributory point, okay, you look at the statute, right? I cited to you the first part of the statute that had a safe harbor, a safe harbor from secondary liability, okay? Now, we cite to the legislative history, and it's in our brief, and the legislative history, Congress said, look, what we're doing here is we're making this safe harbor. Who said it? Congress, in the congressional record. Who's Congress? What senator? What congressman? What committee? It was Orrin Hatch. I'm going to pretend like I'm Justice Scalia, okay? It was Orrin Hatch, Your Honor. It was actually – Okay. I know Orrin Hatch, and you're not Orrin Hatch. I am not Orrin Hatch. No, I am not, Your Honor. So I don't put a lot of store in the legislative history, to be honest with you. Look at the statute. Okay. What in the statute gives you the relief you want? Okay. And again, the statute doesn't say there is secondary liability for – it doesn't come out and say here's – under this statute, under this section, you can proceed with contributory liability. But then again, other statutes don't either, right? There's no statute that says contributory. But then you have the common law background that we started with. Right. Right. Precisely. We don't have that here. That's what – that's what we're struggling with. But I do – but I do have the common law background. And the common law background, the background against which this law was passed was, unfortunately, referred to in the legislative history. And that's at – it's a Senate report dated 1999. This is on page 32 of our brief, page 32 of the appellant's – I'm sorry. This is on page 32 of the appellee's brief, docket number 16-1, page 32. Okay. And this is a citation to the Senate report. And the Senate report says this bill, as amended, also promotes the continued ease and efficiency of users of the current registration system enjoyed by codifying the current case while limiting the secondary liability of domain name registrars and registries for the active registration of a domain name. That's a recognition that secondary liability is out there, and there was a citation to three cases, one of which was the district court Lockheed opinion. But that – but if – if they're making an exception to secondary liability, if this bill is recognizing an existing exception to secondary liability, how can this – on what basis does this Court come out and say there is no secondary liability? The Senate was just wrong. Well, I guess the plain language of the statute. So, I mean, what you say is Congress rejected secondary liability by not including it in the – in the statute. Well, okay. But you're right. There are others. A single congressperson could have suggested that that was a good idea. That wasn't adopted by Congress. Okay. The case that – the case that I would point to is, it's the Meyer case. It's a Supreme Court case. It's cited by Godaddy. And in the Meyer case, it states the proposition that I believe is black-letter law, that when Congress legislates against a background of an existing judge-made law, like secondary liability, unless Congress expressly overrules that or says that secondary liability does not exist, that secondary liability continues to exist. Yes. It's the same thing, if it's the same thing. But that's the question here. We've got a statute that has, you know, you have a – in order to show bad faith, you've got a statutory nine-factor test. Obviously, bad faith was a big, big key for Congress. That's not a factor in contributory negligence and trademark normally. This is a statutorily created requirement to try to narrow down what has to be shown, right, what has to be proven. Well, of course, you're right. But that's for the registrant. That says nothing about the – the contributory infringer. Again, remember, the contributory infringer has to have knowledge and provide the means of the infringement. But doesn't that got to go to the bad faith? You think that there's a wall between registration and knowledge in the contributory sense? Yes. Yes. I think if merely registering a domain name that – well, first of all, just registering a domain name cannot create trademark infringement, right? So – but again, going back to this point, because I feel like this is where we're hanging up a little bit. Are you familiar with the Century Bank of Denver v. First Interstate Bank of Denver? It's a 1994 Supreme Court case. And it rejected secondary liability for actions under Section 10 of the Securities Exchange Act and suggested that you need to look at that principles of secondary liability and their applicability on a case-by-case basis. So it seems like Meyer, the case you cited, that says if Congress creates a tort action, it legislates against the legal background of tort-related vicarious liability rules, but I guess when you have something like Section 10 under the Securities Act, the Supreme Court thought you didn't legislate against those sorts of issues and don't have contributory liability. So is the – I guess the Cyber-Squatting Act, we would have to decide whether it's more like the Fair Housing Act in Meyer or more like the Section 10 in Denver. And do you have any guidance for us on that? I've never heard of that case. I don't know if that was cited in these briefs or not. But I'll tell you this. The Cyber-Squatting Act is part of the Trademark Act. Everybody agrees there's contributory liability for trademark infringement. Who's everybody? There's no agreement that there's contributory liability for trademark infringement? Oh, I'm trademark. I thought you said Cyber-Squatting. Right. Sorry. I meant – okay. You look at the Lockheed case, right? There's a finding that there is contributory liability for trademark infringement. Cyber-Squatting is trademark infringement. It's in the same section of the statute, right? You Cyber-Squat by infringing on a trademark. So, granted, the statute doesn't say there is secondary liability. But, as I said, the statute does create an exemption from secondary liability by its plain language. Okay. You're over time. We'll give you a little bit of time to respond because we've asked you a fair number of questions. But let's hear from GoDaddy, and then we'll give you a little bit of time to respond. Good morning, Your Honor. May it please the Court, John Slavsky for the appellee GoDaddy. Your Honor, one can't help but feel that we're litigating once again the case of Lockheed v. Network Solutions, and for at least the third time. Lockheed v. Network Solutions was squarely about the registration and resolution of an internet name by a registrar. That very same fact pattern was addressed by a district court 16 years ago in 1997, and the Court rightfully concluded that there was no basis for secondary liability against the registrar. So your briefs didn't address the question, which to me is a threshold question, whether there's contributory liability at all in the ACPA. Do you have a position on that issue? I think this is what our briefs have suggested, Your Honor. As you've pointed out, there's no reference to the claim in the statute. We've pointed out that no appellate court has ever recognized such a claim. We have looked at the district court jurisprudence, and we've drawn some guidance from it. The district courts have essentially assumed the existence of this novel claim. And so the argument we put forth in our papers is to the extent such a claim exists, and we don't know that it does, there is no basis in this record for such a claim. Well, in your brief, as I read your brief, you seem to argue that contributory cyber-squatting requires a showing of exceptional circumstances. Does that mean that you concede that such a cause of action exists under ACPA? So, Judge Nelson, no. It's not a concession that the claim exists. Again, what we've done is we've looked at the district courts that have considered this claim, and we've looked at how they've analyzed it. And they've applied requirements such as the direct control requirement or the exceptional circumstances requirement, and we have analyzed those in the context of the case. So we're not suggesting that the claim necessarily exists, but if this Court is going to analyze such a claim, it is going to consider in all likelihood some of the factors that the district courts have considered as well. And we have analyzed it. So it's your preferred result that we assume that there's contributory liability under ACPA, but your argument, except your argument that it's not applicable here, is that your preferred solution? No. I think our preferred solution is that there is no such a claim. And, in fact, I think we've articulated in our papers a policy concern, a policy concern about embroiling intermediaries and service providers in litigation in such a nebulous area of the law. Trademark is notoriously subjective. Cyber-squatting is based on these determinations of individualized bad faith intent to profit, and we think there's some potential negative ramifications. But if the Court gets to the point that it is going to acknowledge this novel claim, then we want to make absolutely clear that there's no basis in the record in any event, Your Honor. Is it strictly fact-based, or are you saying if we got to the point where we felt there were such a cause of action, that, in effect, we would graft Lockheed onto that recognition and have the same defenses in effect? Yes, Your Honor. I mean, Lockheed is the seminal case in this area. I would respectfully suggest that this is Lockheed III or son of Lockheed. Lockheed was about registration and resolution. It does not make any meaningful difference conceptually what form of domain name resolution we're talking about, whether it's routing on the one hand or forwarding on the other. It falls under the Lockheed rubric. It's the same fact pattern addressed by the central district in 97. It's the same fact pattern addressed essentially by this Court in 1999. It's the same fact pattern that was essentially codified via Lockheed I into the ACPA and then litigated yet again years later before the district court in Texas. So opposing counsel suggests that there's a document that said that GoDaddy was, in fact, hosting the infringing site. Is that correct? That is incorrect, Your Honor. GoDaddy has never hosted any of the allegedly infringing content in this matter. And I would point you to the – He said he said ParkWeb on ER-308, that it was hosted on ParkWeb, which is a GoDaddy server. I will explain what that means in one second. The host, the web host in this case is a company called Koledo.net that is reflected in numerous documents. It is reflected in the so-called whois information, the hosting information that was sent to Mr. Clark in an e-mail. It's Supplemental Evidence of Record 100-104. I could also point you out to the – refer you to the Supplemental Evidence of Record pages 176 to 78, page 180 to 81, and page 191 to 207. The hosting that Mr. Clark is referring to is a different kind of technical hosting. The forwarding server maintained by GoDaddy hosts a domain name record. There's something called an index HTML file that effectuates forwarding. It has nothing to do with the hosting of content, the hosting of material on a website. There was no web hosting by GoDaddy. But this is your call forwarding service. This is my call forwarding service. Okay. Or if we used the court's postal service analogy, routing and forwarding are both delivery methods that get the mail to a designated address. Routing sends the mail to an address designated on an envelope. Forwarding sends the mail to an address designated in the postal service records. They're both delivery methods, and they both get the mail to the right place, Your Honor. Let's assume, just arguendo, that we agreed with Mr. Clark's argument and found a contributory right, a contributory infringement cause of action. What would happen in the real world to GoDaddy if such a right existed? Any sense of that? I would be very concerned about the ramifications. So to put this in historical context, at the time the record in the Lockheed case was created, the various courts that addressed that expressed concern about creating any sort of duty or burden for registrars to investigate or intervene. At that time, we know from the record that there were approximately a million domain names registered in the world. We know that Network Solutions, the registrar, was then confronted with about 30 domain name legal proceedings. Fast forward to 2013. The Internet has exploded. We know from the record of this case that there are now over 200 million domain names registered in the world. GoDaddy is the world's largest domain name registrar. It has over 50 million domain names under its management. We know that there have been over 36,000 domain name arbitrations. The consequences of creating this right of action and exposing intermediaries, these neutral stakeholders, to liability could be very significant and very detrimental to companies like GoDaddy or like the other amici who have expressed very strongly in this case that there are significant dangers to finding such duties. Kennedy, would it likely put such companies out of business? Potentially could, Your Honor. The operational consequences of having to investigate these types of claims on a routine basis would be profound. Especially if bad faith is involved, if you have to show it. I believe that's right, Judge Nelson. You know, courts are well positioned to make determinations about bad faith. I don't believe that companies in GoDaddy's position are. And in this particular context, we're talking about a very specific kind of bad faith, bad faith intent to profit from a trademark. I don't believe that registrars and registries are well positioned to make that determination on a regular basis. Well, what about, I think opposing counsel's point is it was brought to your attention by the court that this particular domain name was infringing or cybersquatting. I don't think that's quite right. What was brought to GoDaddy's attention was that a different domain name had been transferred pursuant to a default in a different legal proceeding. There were no findings of fact about cybersquatting. This is the NREM action. That's the NREM action, Your Honor. Is that because it was a default judgment? I mean, what happened here is that Petronas submitted a proposed order. There was no appearance by the registrant, and the court signed it. But there was no discovery, no findings of fact whatsoever. When we look at the ACPA, the Federal statute itself, we know that it embraces and it generally shields from liability registration and maintenance activities. We know also that domain name resolution falls under that rubric of registration and maintenance. We know it for a number of different reasons. First of all, we know that resolution is an essential, basic, fundamental registrar service. It's something that registrars do every second of the day, every day of the year. They cannot register or maintain domain names without either associating them with an IP address, and that's routing, or associating them with a domain name, and that's forwarding. That's an essential part of what they do day in and day out. That's their bread and butter, if you will. We also know, because we look at the surrounding provisions in this statute, the provisions surrounding 15 U.S.C. 1114 2d3, that there was an unmistakable intent by Congress to limit or eliminate liability for these neutral stakeholders, for the registrars and registries. We also know from the legislative history that Congress intended to codify Lockheed One, the district court decision. And frankly, we know that every district court can't do that. Kennedy, if that's true, since Lockheed One, of course, deals with contributory infringement, doesn't that support Mr. Clark's argument that they're all part of one big statute and there is a cause of action for contributory infringement? Maybe Lockheed applies or maybe it doesn't, but it is there. There's no question that Congress codified Lockheed One in the ACPA. And where do you get that from? I don't have a site in front of me, Your Honor, but it's in our papers. The fact that Congress would have codified a decision finding no liability for a registrar based on registration and routing does not necessarily mean that there is an express and distinct contributory liability claim in the statute. Kennedy, I'm troubled by that. It seems to me what you're saying is you're admitting there is a cause of action. If Congress codified Lockheed One, there would have been no reason for it to do so unless it thought Lockheed One applies. Lockheed One applies if there's contributory infringement, right? Lockheed One is also a direct infringement case. So Lockheed One stands for a number of different propositions, including a proposition that there's no secondary liability. But it would have no applicability at all if there is no contributory infringement right under this statute, would it? I think it would, Your Honor, because the statutory safe harbor would be applicable in cases of direct infringement or trademark dilution or unfair competition or whatever the cause of action might be. There are a number of causes of actions at play there, and I don't think when Congress codified the decision, they were necessarily doing so to imply a new and distinct cause of action. What language in the opinion and what language in the statute are you saying codified the opinion language? I'll have to pull my papers. I don't have it in front of me.  My last point about domain name resolution falling under this rubric of registration and maintenance is that each of the district courts that have considered this safe harbor provision have generally construed it to mean protecting registrars when they are, quote, unquote, acting as registrars, and that's exactly what GoDaddy did here. It acted as a registrar. My colleague is calling my attention, Judge Acuda, to the Senate report number 106-140, that's in 1999. It has a Westlaw section, and it states that, quote, So I'm actually more interested in the language of the statute. So there's several statutes which, in the immigration area, which are directed at Ninth Circuit case law. So, for example, they say you can have an adverse credibility determination even if it's not going to the heart of the asylum claim. And that was, like, plucked out of Ninth Circuit case law, and Congress said, no, we disagree with you in Ninth Circuit. So when I hear that a case or a decision is being codified, it usually means there's some language from the case or something pretty specific that then shows up in the statutory language, and I'm wondering if there's anything like that here. Gershengorn Your Honor, there's no particular language like that here. The Senate report that I was referring to says the bill as amended also promotes the continued ease and efficiency for users of the current registration system, and then it cites Lockheed. Ginsburg Would you put the microphone to your head? Gershengorn I'm sorry. It cites Lockheed, and then it just says, holding registrar not liable. So that is the proposition. Kennedy This is the committee report. This is Senator Hatch. What is it? Gershengorn It's the Senate report. Ginsburg The Senate committee report said we don't want the registrar to be liable to see Lockheed. Does that sound like it's? Gershengorn Yes. It's saying for basic registrar activities, they should not be held liable. Ginsburg Okay. Thank you. Gershengorn Your Honor, Judge Smith had earlier invoked Perfect 10 versus Visa. I think that's an excellent analog here. As we all know today, the internet ecosystem operates based on all these intermediaries, all of these service providers, registries, registrars, ISPs, phone companies, cable companies, electrical utilities. They all have the technical ability at some level to turn a switch on or off. But it's not that level of control that the case law contemplates for any kind of finding of secondary liability here. The instrumentality of the cyber squatting, what's at issue in this case, is the selection of some alphanumeric combination that infringes someone's trademark. GoDaddy had nothing to do with that. It was many steps removed from that. It's control, if any, it's technical control, is limited and far more attenuated than any of the cases that have been cited by Petronas in his brief, in particular the cases citing web hosts. Web hosts are in a different factual position. Web hosts are treated as virtual landlords. They lease real estate. They physically host counterfeit material. GoDaddy did nothing of that in this case. So to be sure I understood you correctly, you're saying that the reference that Mr. Clark made to your hosting something is not correct? That's exactly what I'm saying. Well, they host something. Yeah. But they don't host content. It's a very important distinction. They didn't host the infringing material you're talking about. GoDaddy never hosted any of the infringing material. And the record is very clear on that, Your Honor. Okay. Your Honor, I just want to highlight very briefly this question of whether exceptional circumstances that comes up in the case law. Some of the district courts that I've mentioned have assumed that there is this contributory cyber swatting case, and to the extent they've assumed that, they have at least attempted to cabin it in by imposing an exceptional circumstances requirement. That is a standard that has to be higher than reason to know or reason to suspect if we're going to make this a requirement. In the words of Judge Hamilton, there has to be unequivocal knowledge of illegality. There was never unequivocal knowledge of illegality in this case. Unequivocal knowledge of illegality cannot mean, for example, generalized knowledge that one of your tens of millions of customers may be doing something questionable. Unequivocal knowledge of illegality cannot mean generalized knowledge that one of your tens of millions of customers may have registered a domain name that corresponds in some way to a third party trademark. Unequivocal knowledge of illegality cannot mean, and Lockheed One tells us this, the mere receipt of a self-serving notice from a trademark owner about a claim. So if this court gets to the point where it is going to recognize this novel claim that's not in the statute, I would very strongly recommend that it follow the lead of the district courts and include a very strong height and exceptional circumstances requirement. At the end of the day, Your Honors, given the explosive growth of the Internet, the importance of the Internet, and the vital role that domain names play in commerce and communication such as e-mail or expression, it is imperative that this Court reaffirm the role of registrars and registries as neutral stakeholders and that it reaffirm the grant of summary judgment to GoDaddy. Thank you very much. We'll give you a minute to respond. You went over your time, but we'll give you a minute. I do appreciate that because on this point about it's critical to the Internet, there's no evidence in the record for that. There's no evidence in the record about what will happen if domain name registers, I'm sorry, if companies like GoDaddy would have to stop providing a domain name forwarding service to a known cyber squatter. Everything he's talking about is registration. In their brief on page 45, they admit what we're talking about is not registration. So everything that creates an exception for registration does not apply. And on the hosting point, okay, he comes in and says, I'm wrong. He's actually not hosting. I cite you to an e-mail from an internal person at GoDaddy, whose job it was to look at what's going on with this website. He says it's a list of addresses, not the content of the infringing website. Do you disagree with that? I do agree with that. Because, well, I disagree with that in that, based on the argument that that doesn't create liability. And the reason, you don't have to take my word for it. I mean, a panel of this court in Louis Vuitton versus Akhnok Solutions, the site in the briefs, it's, I only have the slip site, but it's cited in our briefs, they basically address that question, right? And they say the exception, to the extent there's an exception to liability in Lockheed, does not apply to these appellants because, as the district court held, appellants physically host websites on their web servers and route Internet traffic to and from those websites. Appellants had direct control over the master switch that kept the websites online and available. This case, don't take my word for it, this case law establishes that they did have the direct control in monitoring. And finally, that they did know that they were dealing with a website that had been transferred in REM. Of course, it was a default procedure because it was in REM. But the district court had defined that the registrant was committing cyber swatting before the domain names could be transferred. So at the very least, that raises an obligation to find out, to look into it, not to be willfully blind, which under the Narc circuit precedence is itself bad faith. Okay. Thank you both for your arguments. We appreciate it. It's a very difficult and interesting area. We will get a response to you. And it is a question of first impression. We know that. Thank you very much. Very good. The case just argued is submitted.
judges: Nelson, Smith, Ikuta